FILED  MAR 08 2006

04-12769

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARY ELLEN JONES,
ARCIECA SHEPPERD,
Plaintiffs,

**ENTERED**
MAR 08 2006
**CLERK OF COURT**

CIVIL ACTION

v.

AAMES FUNDING CORPORATION, et al.,            :            NO. 04-CV-4799
Defendants.

### MEMORANDUM OPINION

J. Davis                                                     March 7th, 2006

Presently before the Court are Aames Funding Corporation's ("Aames") motion for

summary judgment (Doc. No. 26), Countrywide Home Loans' ("Countrywide") and Bankers

Trust Company of California's ("Bankers Trust") memorandum in support of partial summary

judgment (Doc. No. 34), plaintiffs' motion for partial summary judgment (Doc. No. 35), and all

responses and reply briefs thereto.

For the following reasons, this Court grants summary judgment in favor of Aames on all

remaining counts in plaintiffs' complaint, grants summary judgment in favor of Bankers Trust on

plaintiffs' TILA and HOEPA claims, and denies plaintiffs' motion for partial summary judgment

in its entirety.

### I.    Factual and Procedural History

In September 2001, plaintiff Mary Ellen Jones ("Jones") decided to refinance the

mortgage on her home in Philadelphia, Pennsylvania (the "property") to secure extra money for

home improvements and to pay off her existing mortgage. (See Jones Dep., attached as Ex. B to

1

Aames Br., at 45). Jones' existing mortgage was held by Centex Home Equity ("Centex"). (See

Centex Payoff Statement, attached as Ex. C to Pl. Br.; Jones Dep., at 28-32). Under the terms of

the Centex mortgage, Jones made monthly payments of principal and interest in the amount of

$467.21, with an annual interest rate of 10.75%. (See Centex Payoff Statement; Jones Dep., at

35-37).

     Jones was contacted by representatives from Aames Funding Corporation, doing business

as Aames Home Loan (collectively "Aames"), about obtaining a new mortgage loan. (See Jones

Dep., at 57). Jones previously secured a loan through Aames in the late 1990s. (Id., at 27-28).

Jones claims that she requested a loan with a fixed interest rate and monthly payments in an

amount equal to or lesser than her Centex monthly mortgage payments. (Id., at 58-59). At her

deposition, Jones did not remember the exact amount of the loan request, although she later

suggested that this request was approximately $5,000. (Id., at 58, 90). Jones ultimately decided

to use Aames to refinance her mortgage.

     The mortgage closing was held on September 24, 2001. Jones' daughter, plaintiff

Arcieca Shepperd ("Shepperd"), co-signed the loan. (See Shepperd Loan Application, attached

as Ex. E to Aames Br.; Shepperd Dep., attached as Ex. E to Pl. Br., at 11-13). The loan

application, completed and signed by Shepperd, stated that Shepperd and her mother

("plaintiffs") owned the property and that Shepperd presently lived there. (See Shepperd Loan

Application). Shepperd identified her household income as $554.40 per month in social security

income. (Id.). *During her deposition, Shepperd testified that she did not live at the property for*

*a continuous period of time, but, instead, stayed at the property on an occasional basis to care for*

*her mother.* (See Shepperd Dep., at 5-7, 23). Furthermore, Jones testified at her deposition that

her sole source of income was social security disability in the amount of approximately $600/month. (See Jones Dep., at 11).

At closing, plaintiffs executed a note, dated September 24, 2001, in favor of Aames with a principal loan amount of $65,450, an annual interest rate of 9.5%, and a monthly payment of $550.34. (See Note, attached as Ex. G to Pl. Br.). The note was secured by a mortgage on the property, dated September 24, 2001. (See Mortgage, attached as Ex. G to Pl. Br.). In exchange for executing the note and mortgage, Aames paid off the Centex mortgage and ultimately distributed a $2,813 check, dated October 8, 2001, to Jones. (See Centex Payoff Statement; Disbursement Check, attached as Ex. N to Pl. Br.). Jones incurred a $2,139.38 prepayment penalty for paying off her Centex mortgage. (Id.).

Plaintiffs received and signed an array of documents at closing, including Lender Closing Instructions, a Federal Truth in Lending Disclosure Statement, Evidence of Insurance, and a HUD-1 Settlement Statement (the "HUD-1 form"). (See Lender Closing Instructions, attached as Ex. H to Pl. Br.; HUD-1 Form, attached as Ex. I to Pl. Br.; Evidence of Insurance, attached as Ex. K to Pl. Br.; TILA Disclosure Statement, attached as Ex. J to Aames Br.). The HUD-1 form disclosed that Ames charged plaintiffs a premium of $774.75 for title insurance, including fees for three endorsements. (See HUD-1 Form). The HUD-1 form also disclosed that plaintiffs were charged a hazard insurance premium of $772 for a one-year hazard insurance policy with Roth Diversified. (Id.). The title insurance and hazard insurance charges were not included in the $4,747.50 prepaid finance charge calculation of the loan. (See Dep. of Anthony Gioia, Ames' Corporate Designee, attached as Ex. J to Pl. Br., at 45-47). Ultimately, Jones obtained her own policy for homeowners insurance, and $268.83 was refunded to Jones for reimbursement of a

3

portion of the hazard insurance premium. (See United National Group Policy, attached as Ex. L to Pl. Br.; Reimbursement Check, attached as Ex. M to Pl. Br.).

Jones did not read all of the documents she signed at closing. (See Jones Dep., at 70-73). Jones was allegedly unaware at closing of the essential terms of the loan, such as the amount she was borrowing, the required monthly payment, and the interest rate. (Id., at 70-77). Jones also testified that she never reviewed the documents she signed after closing. (Id., at 73). Shepperd, in contrast, understood that Jones' monthly payment would be in excess of $500. (See Shepperd Dep., attached as Ex. D to Ames Br., at 27).

Jones alleges that in October 2001, she received a telephone call from a representative of Aames, who informed Jones that the documents she signed at the loan closing on September 24, 2001 contained errors. (See Jones Dep., at 75-76). According to Jones' testimony, Aames re-sent documents containing blank forms to Jones via federal express delivery. (Id., at 76). Jones signed the forms and returned them to Aames. (Id.). Jones does not identify which documents she allegedly resigned after the loan closing or the difference in terms between the two sets of documents. Nor has Jones produced copies of these post-closing documents.

In December 2001, Aames assigned the mortgage to Bankers Trust, as trustee for the certificate holders of the Aames Mortgage Trust 2001-4 Mortgage Pass-Through Certifications, Series 2001-4. (See Pooling and Serving Agreement ("PSA") between Aames, Bankers Trust, and Countrywide, attached as Ex. F to Pl. Br.; Laura Chavarin Aff., attached as Ex. F to Aames Br., at ¶ 5). Pursuant to the PSA, Countrywide began servicing plaintiffs' mortgage on February 1, 2002. (See Chavarin Aff., at ¶ 6). On April 2, 2002, Countrywide applied Jones' electronic payment in the amount of $550.34 to the wrong account. (See Diane Deloney Aff., attached as

Ex. 3 to Countrywide's Br. In Opp'n., at ¶ 8).  According to Countrywide, this error was

discovered and rectified in May 2002, and no action was taken against plaintiffs' account due to

the error.  (Id., at ¶ 15).

Plaintiffs defaulted on their payments from June 1, 2003 to October 1, 2003.  (See Diane

Deloney Aff., at ¶¶ 17-20).  On September 24, 2003, Jones' attorneys sent a letter to Aames and

Countrywide asserting violations of the Truth in Lending Act ("TILA"), the Home Ownership

and Equity Protection Act ("HOEPA"), and the Pennsylvania Unfair Trade Practice and

Consumer Protection Law ("UTPCPL") in the underlying loan transaction; the September 24,

2003 letter purported to rescind the loan at issue.  (See September 24, 2003 Rescission Letter,

attached as Ex. S to Pl. Br.).  On October 8, 2003, Bankers Trust filed a complaint in foreclosure,

alleging that plaintiffs owe $72,309.74 pursuant to the terms of the loan.  On January 8, 2004,

plaintiffs filed an answer and asserted counterclaims for violations of various federal and state

consumer credit statutes.

On February 27, 2004, Jones filed a voluntary petition for relief in the Eastern District of

Pennsylvania under Title 11, Chapter 13 of the bankruptcy code.  On March 3, 2004, Jones filed

an adversary action against Aames, Bankers Trust, Aames Mortgage Trust, Countrywide, and

several John Does ("defendants").  Jones filed an amended complaint on May 18, 2004, adding

Shepperd as a plaintiff.  (See Amended Compl., attached as Ex. A to Pl. Br.).  The amended

complaint contains the following eight counts:  (i) violations of TILA, 15 U.S.C. § 1601 et seq.,

against Aames, Aames Trust, and Bankers Trust; (ii) violations of HEOPA, 15 U.S.C. § 1639(a),

against Aames, Aames Trust, and Bankers Trust; (iii) violations of the Real Estate Settlement

Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq., against Aames, Aames Trust, Bankers

Trust, and Countrywide; (iv) violations of the Equal Credit Opportunity Act ("ECOA"), 15

U.S.C. § 1691 *et seq.*, against Aames, Aames Trust, and Bankers Trust; (v) violations of the

Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 Pa. C.S. § 2270.1 *et seq.*,

against all defendants; (vi) fraud claim against all defendants; (vii) breach of contract claim

against all defendants; and (viii) violations of the UTPCPL, 73 Pa. C.S. § 201-1 *et seq.*, against

all defendants. On September 28, 2004, this Court withdrew the reference of the adversary

proceeding to the bankruptcy court. On October 22, 2004, Jones filed a notice converting her

Chapter 13 petition into a Chapter 7 petition.

On October 21, 2005, Aames filed a summary judgment motion, seeking summary

judgment on all claims in plaintiffs' amended complaint. (Doc. No. 26). On November 4, 2005,

Bankers Trust and Countrywide filed a memorandum joining Aames' summary judgment motion

as to the TILA, HOEPA, and ECOA claims. (Doc. No. 34). After requesting and receiving an

extension of time, plaintiffs ultimately filed their motion for partial summary judgment on the

TILA, HOEPA, and UTPCPL claims on November 14, 2005. (Doc. No. 35). On November 23,

2005, plaintiffs stipulated to the dismissal of the RESPA, ECOA, and FCEUA claims against

Aames. (Doc. No. 38). On January 30, 2006, plaintiffs stipulated to the dismissal of the ECOA

claim against Bankers Trust. (Doc. No. 44).

## II.    Discussion

Aames, Bankers Trust, and plaintiffs have filed motions for summary judgment. In

considering a motion for summary judgment, the court must determine whether "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247 (1986); Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir.

1986). Only facts that may affect the outcome of a case are "material." Anderson, 477 U.S. 248.

All reasonable inferences from the record are drawn in favor of the non-movant. Id. at 256.

The movant has the initial burden of demonstrating the absence of genuine issues of

material fact. This "burden . . . may be discharged by 'showing' that there is an absence of

evidence to support the non-moving party's case." Celotex Corp. v. Catreet, 477 U.S. 317, 323

(1986). Once this burden is discharged, the non-movant must then establish the existence of

each element on which it bears the burden of proof. See, e.g., J.F. Feeser, Inc. v. Serv-A-Portion,

Inc., 909 F.2d 1524, 1531 (3d Cir. 1990). A non-moving party with the burden of proof cannot

avert summary judgment with speculation or by resting on the allegations in her pleadings, but

rather must present competent evidence from which a jury could reasonably find in her favor.

See, e.g., Anderson, 477 U.S. at 248; Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238,

252 (3d Cir. 1999); Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989);

Woods v. Bentsen, 889 F. Supp. 179, 184 (E.D. Pa. 1995).

### A.    Aames' Motion for Summary Judgment

Aames moves for summary judgment on all remaining claims in plaintiffs' complaint,

including plaintiffs' TILA claim, HOPEA claim, breach of contract claim, UTPCPL claim, and

fraud claim.

### 1.    TILA

Aames moves for summary judgment on the damages and rescission components of

plaintiffs' TILA claim. Aames argues that plaintiffs' TILA claim fails as a matter of law because

7

Aames provided all material disclosures and because these disclosures, including the finance

charge calculation, were accurate. (See Aames Br., at 12-16). In response, plaintiffs argue that

Aames improperly excluded the hazard insurance premium and title insurance premium from the

finance charge, thereby violating TILA. (See Pl. Br. In Opp'n, at 10-19).

### a.    Hazard Insurance

Under TILA, the premium for insurance "against loss of or damage to property," such as

hazard insurance, may be excluded from the finance charge upon the satisfaction of three

conditions. See 15 U.S.C. § 1605(c); 12 C.F.R. § 226.4(d)(2). First, the lender must disclose to

the borrower that she may obtain hazard insurance from the company of her choice. Id. §

226.4(d)(2)(i). Second, "if the coverage is obtained from or through the creditor," the lender

must disclose the premium for the initial term of insurance coverage. Id. § 226.4(d)(2)(ii).

Third, if the term of the insurance is less than the term of the transaction, the lender must disclose

the term of the insurance coverage. Id.

Aames admits that the hazard insurance premium charged to plaintiffs was excluded from

the finance charge, but argues that it satisfied the three conditions for exclusion. (See Aames Br.

In Opp'n, at 6-9). Plaintiffs concede that Aames notified them of their option to purchase hazard

insurance through an insurer of their choice. (See Pl. Br., at 15).[1] Plaintiffs also concede that the

---

[1] The TILA disclosure form specifically states that "[y]ou may obtain property insurance
from an insurer of your choice that is acceptable to this institution." (See TILA Disclosure
Statement, attached as Ex. X to Pl. Mot.); Stump, 2005 WL 645238, at *6 (disclosure telling
borrower that she "may obtain obtain the [property] insurance from anyone that is acceptable to
the creditor" satisfies § 226.4(d)(2)(i) requirement). In addition, Aames' closing instructions
notified borrowers that Aames "encourages me to provide Aames with my own fire and extended
hazard insurance policy as soon as possible." (See Aames Closing Instructions, attached as Ex.
H to Pl. Mot.). Illustrating in part the effectiveness of the notification, plaintiffs ultimately
obtained hazard insurance from a separate insurer after closing, and received a partial refund of

HUD-1 form lists the premium for hazard insurance. (See Pl. Br. In Opp'n,, at 13). However, plaintiffs claim that the hazard insurance policy was secured through Aames at closing and that Aames failed to provide plaintiffs with documentation indicating that the insurance was subject to a one-year term. (Id., at 13-14).

Assuming *arguendo* that the hazard insurance policy was "obtained from or through" Aames within the meaning of § 1605(c), this Court finds that Aames is entitled to summary judgment on this theory of TILA liability. The one-year term of the hazard insurance policy is clearly displayed on the HUD-1 form, on the very same line as the premium amount. (See HUD-1, attached as Ex. B to , at line 903). Accordingly, because Aames disclosed to plaintiffs their right to obtain hazard insurance from an insurer of their choice, the premium of the hazard insurance policy, and the term of this policy, Aames properly excluded the amount of the premium from the finance charge calculation pursuant to § 1605(c) of TILA.

### b.    Title Insurance

A premium for title insurance may be properly excluded from the finance charge calculation. See 15 U.S.C. § 1605(e). This exclusion only applies if the title insurance premium is both "bona fide and reasonable." 12 C.F.R. § 226.4(c)(7). The parties concede that the title insurance premium was excluded from the finance charge calculation, but disagree as to whether the amount charged to plaintiffs was reasonable.

Courts generally assess the reasonableness of a title insurance premium "through comparison of the disputed charges with the prevailing rates of the industry in the locality."

---

the hazard insurance premium charged at closing. (See Homeowner's Policy, attached as Ex. L to Pl. Mot.; Reimbursement Check, attached as Ex. M to Pl. Br.).

Johnson v. The Know Financial Group, 2004 WL 1179335, at *6 n.5 (E.D. Pa. 2004). Courts

often use the Manual of the Title Insurance Rating Bureau of Pennsylvania (the "Manual") as the

gauge for determining the reasonableness of title insurance rates in Pennsylvania. Id.; see also

Oscar v. Bank One, 2006 WL 401853, at *6 (E.D. Pa. Feb. 17, 2006) (using Manual to determine

reasonableness of title insurance charge); Stump v. WMC Mortgage Corp., 2005 WL 645238, at

*5 (E.D. Pa. March 16, 2005) ("any fee charged for title insurance which exceeds the fee

authorized by the Manual . . . is unreasonable and must be disclosed as a finance charge").

The Manual identifies the maximum allowable rate of insurance in 2001 on a $65,450

loan as $624.75. (See Manual, attached as Ex. Y to Pl. Mot.).[2] The Manual identifies the

"reissue" rate of title insurance on such a loan as $562.28. (Id.). Moreover, the Manual indicates

that a party may receive a refinance rate, which is a reduced version of the reissue rate, "when a

refinance or substitution loan is made within 3 years from the date of closing of a previously

insured mortgage or fee interest and the premises to be insured are identical to or part of the real

property previously insured and there has been no change in the fee simple ownership." (Id., at §

5.6).

This Court finds that plaintiffs have failed to raise a genuine issue of material fact as to

the unreasonableness of the title insurance premium. First, Aames presents evidence to indicate

that plaintiff was charged the maximum allowable rate of $624.75 for title insurance, as

prescribed by the Manual. The HUD-1 form states that plaintiffs were charged $774.75 for title

---

[2]This Court finds that plaintiffs' excerpts of the Manual are admissible. As a document
issued by a public authority, the Title Insurance Rating Bureau of Pennsylvania, the Manual is
self-authenticating. See Fed. R. Evid. 902(5) (publication issued by public authority is self-
authenticating).

insurance, an amount which also included the costs of Endorsements PA 100, 300, and 900. (See

HUD-1 Form, at Line 1108). Aames provides affidavit testimony from Sean Bello, general

counsel for Advantage Equity Services ("Advantage"), the title company that serviced plaintiffs'

loan transaction, that plaintiffs were not charged the entirety of the $774.75 fee for the title

insurance premium, but, instead, were charged $624.75 for the premium, plus $150 for the three

endorsements. (See Bello Aff., attached as Ex. C to Def. Br. In Opp'n, at ¶¶ 1-10). Bello's

affidavit further indicates that Advantage's practice is to combine the charges for endorsements

with the title insurance premium. (Id., at ¶ 11). Plaintiffs fail to present any evidence to discredit

or cast doubt on this affidavit testimony. Nor do plaintiffs argue, let alone present evidence to

establish, that endorsement charges and title insurance premium costs may not be combined in

mortgage disclosure forms, that the endorsement fees incurred by plaintiffs were unreasonable,

and/or that endorsement fees must be included in the finance charge calculation. See 15 U.S.C. §

1605(e)(1) ("fees or premiums" for title insurance may be excluded from finance charge

computation); Stump, 2005 WL 645238, at *5 (no TILA violation when lender excludes from

finance charge title insurance premium and endorsement fee of $200 for four endorsements to

title insurance, including $50/endorsement charge for Endorsements PA 100, 300, and 900).

Second, plaintiffs fail to present evidence to indicate that they were entitled to the reissue

rate. Neither plaintiffs nor plaintiffs' expert, Margot Saunders ("Saunders"), an attorney for the

National Consumer Law Center, provide the eligibility criteria for the reissue rate. (See Pl.

Expert Report, attached as Ex. W to Pl. Br., at 12-14).[3] Nor do they suggest how the facts of this

---

[3]Aames challenges the admissibility of plaintiffs' expert report, arguing that Saunders has
not been qualified as an expert and that her report will not assist the trier of fact in accordance
with Rule 702 of the Federal Rules of Evidence. (See Aames Br., at 5-6). This Court need not

11

litigation qualify plaintiffs for the reissue rate under the standards promulgated in the Manual.

Furthermore, to the extent the reissue rate is contingent upon proof of an earlier title insurance

policy, no evidence exists to suggest that plaintiffs provided Aames with a copy of this policy.

See, e.g., Ricciardi v. Ameriquest Mortgage Co., 2005 WL 61416, at *3 (E.D. Pa. Jan. 10, 2005)

(finding that plaintiff did not establish unreasonableness of lender's charge of basic rate for title

insurance because plaintiff failed to produce evidence of earlier policy necessary to qualify for

reissue rate).

Third, plaintiffs fail to present evidence showing their eligibility for the refinance rate, as

outlined in § 5.6 of the Manual.  Although Jones asserts that her prior mortgage was previously

insured, plaintiffs provide no evidence, such as a copy of a previously issued title insurance

policy, to verify this statement.  See, e.g., Stump, 20005 WL 645238, at *5 (granting summary

judgment to lender on borrowers' TILA claim when plaintiff offers no evidence to suggest

entitlement to refinance rate under § 5.6 of Manual, such as copy of earlier title insurance policy).

Nor did plaintiffs provide this proof at closing.  (See Bello Aff., at ¶ 13) ("The borrowers did not

provide proof at closing that the refinance on September 24, 2001 was closing within three years

of the closing of a previously insured mortgage"); Ricciardi, 2005 WL 61416, at *3 (plaintiff not

entitled to refinance rate because plaintiff provided no evidence of prior title policy to lender).

Furthermore, Ames presents a copy of a September 24, 2001 Indenture transferring ownership of

the property from Jones to Jones and Shepperd, thereby indicating a change in fee simple

---

resolve this issue, as the Court finds that Aames is entitled to summary judgment on the
remaining counts in plaintiffs' amended complaint notwithstanding the content of plaintiffs'
expert report.  Accordingly, the Court assumes the admissibility of Saunders' report for purposes
of resolving the instant summary judgment motions.

ownership within three years from the previous loan closing (i.e., the Contex mortgage) in May

2000. (See September 24, 2001 Indenture, attached as Ex. D to Aames Br In Opp'n; Records of

Centex Mortgage, attached as Ex. Z to Pl. Br.); In re Strong, 2005 WL 1463245, at *5 (E.D. Pa.

June 20, 2005) (borrower not entitled to refinance rate for title insurance because property was

transferred from single to joint ownership within three years from closing date of previously

insured mortgage, even though lender required transfer as precondition for loan).

In summary, this Court finds that plaintiffs have failed to present any evidence that they

were charged an unreasonable amount for title insurance at closing. Specifically, plaintiffs have

failed to raise a genuine issue of material fact that they were charged more than the maximum

charge for title insurance under the Manual or that they were eligible for the reissue or refinance

rate. Accordingly, because no evidence exists to suggest that the $624.75 charge for title

insurance, plus the $150 charge for three endorsements, was unreasonable, Aames properly

excluded the title insurance premium from the finance charge calculation and is therefore entitled

to summary judgment on this theory of TILA liability.

### c.    Conclusion

This Court grants summary judgment to Aames on plaintiffs' TILA claim, finding as a

matter of law that plaintiffs are not entitled to damages or rescission for Aames' alleged

violations of TILA. As such, the Court need not address Aames additional argument that the

damages component of plaintiffs' TILA claim for disclosure violations is time-barred. (See

Aames Br., at 7-9).

### 2.    HOEPA

Aames argues that the loan transaction was not subject to HOEPA and its disclosure

requirements. (See Def. Br., at 16). Plaintiffs, in turn, claim that once the title insurance and homeowners insurance premiums are properly added to the finance charge, the loan transaction triggers the protections of HOEPA. (See Pl. Br. In Opp'n, at 19).

A lender must provide a consumer with HOEPA disclosures when the loan qualifies as a "high-cost loan." A "high-cost loan" is a loan where the "points and fees" payable by the consumer at or before closing exceed 8% of the total loan amount. 15 U.S.C. § 1602(aa)(1)(B); 12 C.F.R. § 226.32(a). Therefore, a determination of whether a loan falls within the scope of HOEPA and its mandatory disclosure obligations requires a two-prong analysis: (i) determining the amount of "points and fees;" and (ii) determining whether these "points and fees" exceed 8% of the "total loan amount." See, e.g., Johnson, 2004 WL 1179335, at *5.

Regulation Z defines "points and fees" and the "total loan amount." First, "points and fees" include: (i) all items included in the finance charges, except interest or the time-price differential; (ii) all compensation paid to mortgage brokers; (iii) all items listed in § 226.4(c)(7) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and (iv) premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage. 12 C.F.R. § 226.32(b)(1)(i)-(iv); see also 15 U.S.C. § 1602(aa)(4)(C). Second, the "total loan amount" is defined as the amount financed[4] minus settlement charges both included in "points and fees" pursuant to § 226.32(b)(1)(iii) or § 226.32(b)(1)(iv) and financed by the creditor. See Official Staff Commentary to 12 C.F.R. § 226.32(a)(1)(ii) ("For

─────────────────

[4]The "amount financed" is defined according to the following equation: the principal loan amount + any amounts financed not included in the finance charge - the prepaid finance charge. See 12 C.F.R. § 226.18.

14

purposes of the 'points and fees' test, the total loan amount is calculated by taking the amount financed, as determined according to § 226.18(b), and deducting any cost listed in § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under § 226.32(b) and financed by the creditor").

This Court finds that the fees for hazard insurance and title insurance are properly excluded from the "points and fees" calculation pursuant to § 226.32(b)(1)(iii): these fees were reasonable; Aames did not receive direct or indirect compensation in connection with the fees; and the fees were not paid to an affiliate of Aames.[5] Without the inclusion of the hazard insurance and title insurance premiums, the "points and fees" in plaintiffs' loan ($4,747.50) (i.e., the prepaid finance charge)[6] is less than 8% of the entire loan amount ($60,702.50) (i.e., the principal amount minus the points and fees). To be specific, the "points and fees" reach 7.8% of the entire loan amount. Indeed, plaintiffs' argument implicitly concedes that if the hazard insurance and title insurance fees were properly excluded from the finance charge calculation, the "points and fees" fail to meet the 8% threshold for triggering HOEPA disclosures. Consequently, this Court grants summary judgment to Aames on plaintiffs' HOEPA claim.

### 3.    Breach of Contract

Aames argues that plaintiffs lack evidence to support their breach of contract claim. (See

---

[5]An affiliate is defined as "any company that controls, is controlled by, or is under common control with another company, as set forth in the Bank Holding Company Act of 1956." See 12 C.F.R. § 226.32(b)(2).

[6]Plaintiffs' expert calculates the "points and fees" at $4,247.50. (See Saunders Report, at 14). However, because Aames' calculation is higher ($4,747.50), and includes the $400 settlement fee paid to Maureen Gavek and the $100 disbursement fee paid to Advantage, the Court uses the more pro-plaintiff figure advanced by Aames. (See Aames Br. In Opp'n, at 16).

15

Aames Br., at 21-23). In response, plaintiffs argue that the parties clearly entered into a mortgage

contract on September 24, 2001 and that Aames breached this contract by failing to comply with

TILA and HOEPA, as required by the terms of the note and mortgage, by failing to disclose

plaintiffs' prepayment penalty of $2,139.18 to her existing mortgage company, and by conflating

the income of Jones and Shepperd to enable plaintiffs to qualify for the loan. (See Pl. Br., at 22-

26).

Under Pennsylvania law, a plaintiff seeking summary judgment on a breach of contract

action must demonstrate as a matter of law that a valid contract exists, including its essential

terms, that defendants breached a duty imposed under the contract, and that damages resulted.

See, e.g., Omicron Systems v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004).

This Court grants summary judgment in favor of Aames on plaintiffs' breach of contract

claim. Although this Court finds that a valid mortgage contract existed between Aames and

plaintiffs on September 24, 2001, plaintiffs have failed to present any evidence of a breach of this

contract. Indeed, this Court rejects each of plaintiffs' alleged breaches as a matter of law. First,

this Court has already found that Aames did not violate TILA and HEOPA. Second, plaintiffs

fail to identify any express or implied provision in the mortgage contract that prohibited Aames,

in its mortgage eligibility analysis, from conflating the social security income of Jones and

Shepperd and then from adjusting this income upward according to the favorable tax

consequences of this form of income.[7] Indeed, even if this technique of conflating and adjusting

---

[7]According to plaintiffs' expert, this process is known as "grossing up" income. (See
Saunders Report, attached as Ex. W to Pl. Br., at 5). The practice of "grossing up" accounts for
"the tax benefit to recipients of Social Security or SSI income who do not have to pay taxes on
their income." (Id., at 5).

plaintiffs' income violated industry standards, this behavior occurred during the loan approval

process, prior to the formation of the mortgage contract on September 24, 2001, rather than in the

execution and performance of the note and mortgage. Third, plaintiffs fail to provide any

evidence to indicate both that Aames was *contractually* obligated, by virtue of an express

provision in the note and mortgage or by application of some other law, to disclose a pre-

payment penalty to Jones' then existing mortgage company and that Aames failed to disclose this

penalty.

Because plaintiffs have failed to identify the provisions of the September 24, 2001 note

and mortgage that Aames allegedly breached, and because plaintiffs have failed to present

evidence to support any alleged breaches of the September 24, 2001 note and mortgage,

plaintiffs' breach of contract claim against Aames fails as a matter of law.

### 4.    UTPCPL

Aames argues that plaintiffs lack any evidence of UTPCPL violations on the part of

Aames. (See AAames Br., at 23-28). In response, plaintiffs argue that Aames' violations of

TILA and HOEPA, Aames' failure to disclose the applicability of the prepayment penalty, and

Aames' failure to perform an appropriate income qualification analysis constitute "deceptive"

trade practices in violation of the "catch-all provision" of the UTPCPL. (See Pl. Br. In Opp'n, at

29-32).

The UTPCPL prohibits "unfair methods of competition or unfair or deceptive acts or

practices in the conduct of any trade or commerce." 73 P.S. § 201-1. The statute prohibits

twenty specific forms of "unfair or deceptive acts or practices." Id. § 201-2(4)(i)-(xx). In

addition, the statute contains a "catch-all" provision, which prohibits all "fraudulent or deceptive

17

conduct which creates a likelihood of confusion or misunderstanding." Id. § 201-2(4)(xxi).

Plaintiffs rely upon the "catch-all" provision as the basis for the UTPCPL claim against

Aames. (See Pl. Br. In Opp'n, at 30-32). Courts are divided as to the governing standard for a

claim under the catch-all provision of the UTPCPL. Some courts require a plaintiff asserting a

claim under § 201-2(4)(xxi) to meet the elements of common law fraud. See, e.g., Rock v.

Voshell, 397 F. Supp. 2d 616, 622 (E.D. Pa. 2005) ("While there is some uncertainty as to the

requirements in proving a UTPCPL case under the catch all provision, Pennsylvania courts have

recently held that all of the fraud elements are still required, even with the addition of the

'deceptive' language"); Cheatle v. Katz, 2003 WL 21250583, at *8 (E.D. Pa. April 1, 2003)

(same); Skurnowicz v. Lucci, 798 A.2d 788, 794 (Pa. Super. Ct. 2002) (plaintiff must prove all

the elements of common law fraud to establish violation of § 201-2(4)(xxi)). Other courts read

the inclusion of the term "deceptive" in § 201-2(4)(xxi) as creating an alternative, less rigorous

level of proof that falls short of actual fraud. See Christopher v. First Mutual Corp., 2006 WL

166566, at *3 (E.D. Pa. Jan. 20, 2006) (holding that it is "no longer necessary for a plaintiff to

plead all of the elements of common law fraud to recover under the UTPCPL catchall

provision"); In re Patterson, 623 B.R. 82, 92 (Bankr. E.D. Pa. 2001) (holding that Pennsylvania

legislature expanded scope of catch-all provision beyond fraudulent conduct). These courts

require a plaintiff to prove that a defendant's conduct intentionally gave a false impression, that

plaintiff relied on some level upon this deceptive act, and that the use of this deceptive act

resulted in damages. See, e.g., In re Fisher, 320 B.R. 52, 71 (Bankr. E.D. Pa. 2005) (to prevail

under UTPCPL deception standard, plaintiff must establish that defendant made a false

representation that deceived or had a tendency to deceive and that the representation was likely to

affect plaintiff's decision to enter the mortgage).

This Court need not conclusively determine whether a claim under the catch-all provision of the UTPCPL requires proof of common law fraud, as compared to a less stringent standard of proof.[8] Instead, assuming *arguendo* that a claim under § 201-2(4)(xxi) need only satisfy the elements of the less stringent standard applicable to "deceptive" (as opposed to fraudulent) conduct, this Court still finds that plaintiffs have failed to meet this standard.

This Court rejects each of plaintiffs' theories of UTPCPL liability. First, as previously discussed in this opinion, plaintiffs fail to present any evidence that Aames violated TILA and HEOPA. Second, plaintiffs fail to present any evidence outside of the pleadings to support their contentions that Aames failed to disclose the prepayment penalty of $2,139.18 to plaintiffs.[9] See Fed. R. Civ. P. 56(e) (adverse party may not rely upon allegations or denials in pleadings to raise genuine issue of material fact). Nor have plaintiffs offered evidence, such as affidavit or deposition testimony, to suggest that the non-disclosure of the alleged pre-payment penalty impacted plaintiffs' decision to enter into the mortgage transaction. See In re Fisher, 320 B.R. at

---

[8]The Court expresses grave doubt as to the validity of the non-fraud "deception" standard under § 201-2(4)(xxi) after the Third Circuit's decision in Tran v. Metropolitan Life Ins. Co., 408 F.3d 130 (3d Cir. 2004). Although Third Circuit in Tran never expressly determined whether a plaintiff must prove common law fraud under the catch-all provision, the Third Circuit nonetheless rejected plaintiff's position that he was "not required to prove the elements of common law fraud with regard to certain sections of the UTPCPL" and held that a plaintiff who brings claims under § 201-2(4)(v), (vii), (ix), (xiv), and (xv) of the UTPCPL must prove justifiable reliance, an element of common law fraud. Id. at 140. The Third Circuit surveyed applicable precedent from the Pennsylvania state courts, and endorsed the Pennsylvania Superior Court's rejection of the distinction between fraud and non-fraud claims under the UTPCPL. Id.

[9]The Court notes both that this prepayment penalty was identified in the Centex Payoff Statement and that plaintiffs fail to argue that they never received this Statement. (See Centex Payoff Statement, attached as Ex. C to Pl. Br.).

19

71 (requiring some causation element under UTPCPL deception standard).    Third, although

plaintiffs' expert concludes that Aames violated industry standards by considering the social

security income of Jones and Shepperd in the income qualification analysis, despite Shepperd's

lack of residence at the property, it is clear both that Shepperd represented to Aames through the

loan application process that she did reside at the property and that Shepperd never rectified this

alleged misrepresentation.  Thus, Aames' use of Shepperd's social security income did not

deceive plaintiffs, as it was based upon their own representations.  (See Loan Application, at 1).

###    5.    Fraud

Aames argues that because Jones did not file the instant action until March 3, 2004 and

because Shepperd did not join in the action until May 18, 2004, plaintiffs' common law fraud

claim is barred by the applicable two-year statute of limitations.  (See Pl. Br., at 12).  In response,

plaintiffs concede that their claim is time-barred if the two-year limitation period runs from the

time of the closing of the transaction; however, plaintiffs contend that the doctrine of fraudulent

concealment tolls this limitation period.  (See Pl. Br., at 26-27).

Pennsylvania's statute of limitation for fraud claims is two years.  See 42 Pa. Cons. Stat.

Ann. § 5524.  However, Pennsylvania's discovery rule "'delays the running of the statute until

the plaintiff knew, or through the exercise of reasonable diligence should have known, of the

injury and its cause.'"  Beauty Time, Inc. v. VU Skin Systems, Inc., 118 F.3d 140, 144 (3d Cir.

1997) (internal citations omitted).

This Court concludes that Pennsylvania's two-year limitation period started to run either

on September 24, 2001, on the date of the consummation of the transaction, or in October 2001,

when Jones received her loan check from Ames.  For instance, once Aames' alleged TILA and

HOEPA violations are properly disregarded, plaintiffs' theory of fraudulent concealment is predicated upon fraud in the loan origination process, alleging that the terms of the loan, while accurate, differed from previous, pre-transaction representations. (See Pl. Br., at 27) ("The fraudulent concealment caused Plaintiffs to obtain a mortgage with a higher monthly payments than was originally promised to them by Aames"). Because plaintiffs, even as elderly, low-income borrowers, had a duty to read their mortgage contract and the documents they signed at closing, including the loan application, the HUD-1 form, and the TILA Disclosure Statement, plaintiffs should have known of their injury on the date of the closing by comparing the terms of the signed documents with the terms plaintiffs expected. See In re Fisher, 320 B.R. at 71 (noting plaintiff's obligation to read the loan documentation and understand the significance of the documents she signed); 17A Am. Jur. 2d Contracts § 210 (2004) ("a party who could have discovered the fraud by reading the contract, and in fact had an opportunity to do so, cannot later be heard to complaint that the contractual terms are binding"). In fact, plaintiff Jones admits that she did not read all the documents she signed at closing, and, in fact, never reviewed the note and mortgage after closing to discover the exact terms of the loan. (See Jones Dep., at 70-77); In re Roberson, 262 B.R. 312, 322 (Bankr. E.D. Pa. 2001) (doctrine of fraudulent concealment does not toll limitation period when plaintiff should have read mortgage contract and discovered facts giving rise to claim). At the very least, plaintiffs should have discovered the alleged fraud in October 2001, when Jones received the $2,813 check, dated October 8, 2001, that was significantly less than the $5,000 loan Jones allegedly requested from Aames for home improvements (See Jones Dep., at 90). Finally, the Court notes that plaintiffs have not argued that deceit by defendants after the September 24, 2001 closing or after the receipt of the $2,813

21

check in October 2001 caused plaintiffs to relax their vigilance in discovering defendants'

alleged misrepresentations.  See, e.g., Foster v. Equicredit Corp., 2001 WL 177188, at *1, 3

(E.D. Pa. Jan. 26, 2001) (denying summary judgment to lenders on statute of limitations defense

when "due diligence would not have yielded the discovery of the alleged fraud at the closing

date" because defendants allegedly misrepresented the nature of certain fees "both at the closing"

and during plaintiffs' interactions with defendants "for an undetermined period of time following

the closing date").[10]

Plaintiffs do not argue at the summary judgment stage that defendants continued to make

misrepresentations after Jones' receipt of the $2,813 check in October 2001.  Nor do plaintiffs

justify their failure to read and to familiarize themselves with the content of the documents they

signed at closing.  Thus, plaintiffs, through reasonable diligence, should have discovered

defendants' alleged fraud, and recognized the ramifications of signing a note and security

agreement with terms in alleged conflict with plaintiffs' pre-transaction expectations and

defendants' pre-transaction representations, at closing or shortly thereafter.  Because the

limitation period for plaintiffs' fraud claim started to run, at the latest, in October 2001, and

because Jones did not file the instant action until March 3, 2004, plaintiffs' fraud claim is

therefore time-barred.

**B.      Bankers Trust's Motion for Summary Judgment**

On November 4, 2005, Bankers Trust filed a memorandum of law in response to Aames'

---

[10]Plaintiffs' brief in opposition to Aames' summary judgment motion does not argue that post-closing interactions between plaintiffs and Aames concealed the fraud. (See Pl. Br. In Opp'n, at 26-28).  Furthermore, the Court notes that plaintiffs present no evidence in support of plaintiffs' allegations that additional documents were signed after closing.

22

motion for summary judgment. The memorandum joins Aames' motion for summary judgment on plaintiffs' TILA, HOEPA, and ECOA claims. (See Bankers Trust's Mem., at 2). On January 30, 2006, plaintiffs stipulated to the dismissal of their ECOA claim against Bankers Trust. (See Doc. No. 44). Accordingly, this Court need only address the validity of plaintiffs' TILA and HOEPA claims against Bankers Trust.

Bankers Trust, trustee of the trust to which the loan was assigned, correctly points out that its potential liability as an assignee under TILA and HOEPA hinges upon a finding of liability as to Aames, the original lender. See 15 U.S.C. § 1641(a) (assignee liable under TILA for violations by original creditor when violation is "apparent on the fact of the disclosure statement"); 15 U.S.C. § 1641(d) (assignee liable under HOEPA for violations by original creditor unless assignee could not determine, through due diligence of the available documentation, that loan was subject to HEOPA). Because this Court has granted summary judgment to Aames on plaintiffs' TILA and HEOPA claims, this Court also grants summary judgment to Countrywide and Bankers Trust on these claims.

### C.    Plaintiffs' Motion for Summary Judgment

Plaintiffs move for partial summary judgment on their TILA, HOEPA, and UTPCPL claims. Based upon this Court's previous findings, plaintiffs' motion for partial summary judgment is denied as to the TILA, HOEPA, and UTPCPL claims against Aames and Bankers Trust.[11] However, plaintiffs also seek summary judgment against Countrywide on their UTPCPL claim under a theory of liability distinct from that asserted against Aames and Bankers

---

[11]Although Bankers Trust has not moved for summary judgment on plaintiffs' UTPCPL claim, plaintiffs seek to hold Bankers Trust liable under UTPCPL for the same violations alleged against Aames. (See Pl. Br., at 24-25).

23

Trust. The UTPCPL claim against Countrywide thus requires an independent analysis.

Plaintiffs claim that Countrywide improperly serviced plaintiffs' mortgage account in violation of the catch-all provision of the UTPCPL. (See Pl. Br., at 25-27). Specifically, plaintiffs contend that Countrywide applied Jones' mortgage payment to another account on one occasion and that Countrywide was unable to provide proof that this error was rectified. (Id.).

This Court finds that, although Countrywide applied Jones' April 2, 2002 electronic payment to the wrong loan, Countrywide has raised a genuine issue of material fact as to whether this incident, standing alone, constitutes "deception" within the meaning of the UTPCPL. Indeed, Countrywide provides affidavit testimony indicating that the misapplication of Jones' April 2, 2002 payment was an innocent, one-time mistake, due in part to Jones' misidentification of her loan number on her electronic payment submission. (See Deloney Aff., attached as Ex. 3 to Countrywide's Br. In Opp'n, at ¶¶ 8-10, 15). This testimony, if believed, suggests unintentional error, rather than fraudulent conduct or an intentionally misleading act of deception. See, e.g., Christopher, 2006 WL 166566, at *3 (adopting Black's Law Dictionary's definition of deception as "intentionally misleading by falsehood spoken or acted").

This Court also finds that a genuine issue of material fact exists as to whether plaintiffs suffered any adverse consequences from Countrywide's misapplication of this payment. Countrywide's Assistant Manager of the Foreclosure and Bankruptcy Real Estate Management Department, Diane Deloney, provides an affidavit stating that the error was detected in May 2002, that Jones' monthly payment was reapplied to plaintiffs' account, and that plaintiffs were not charged any late fees. (See Deloney Aff., attached as Ex. 3 to Countrywide's Br. In Opp'n, at ¶¶ 12-15). This testimony was also echoed in part at her deposition, in which she stated that

24

plaintiffs' loan history indicated a correction of the misapplied payment. (See Deloney Dep.,

attached as Ex. 2 to Countrywide's Br. In Opp'n, at 68-72). Furthermore, Deloney's affidavit

iterates that the misapplication of the April 2002 payment had no influence on the subsequent

foreclosure proceedings, which originated after a series of missed payments in June through

October 2003. (See Deloney Aff., at ¶¶ 17, 21).

### D.    Conclusions

For the following reasons, this Court grants Aames' motion for summary judgment in its

entirety, grants summary judgment to Bankers Trust on plaintiffs' TILA and HOEPA claims, and

denies plaintiffs' motion for summary judgment. An appropriate Order follows.

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARY ELLEN JONES,            :
ARCIECA SHEPPERD,            :            CIVIL ACTION
      Plaintiffs,               :
                     :
    v.                          :
                     :
AAMES FUNDING CORPORATION, et al.,  :        NO. 04-CV-4799
      Defendants.

## ORDER

      AND NOW, this 7th day of March 2006, upon consideration of the pending summary

judgment motions (Doc. No. 26, 34, 35), and all responses and replies thereto, it is hereby

ORDERED as follows:

1.    Aames Funding Corporation's and Aames Home Loan's (collectively "Aames") motion
    for summary judgment (Doc. No. 26) is GRANTED.

2.    Summary judgment is entered in favor of Aames and against plaintiffs on all remaining
    counts against Aames in plaintiffs' amended complaint.

3.    Bankers Trust Company of California's ("Bankers Trust") motion for partial summary
    judgment (Doc. No. 34) is GRANTED.

4.    Summary judgment is entered in favor of Bankers Trust and against plaintiffs on
    plaintiffs' TILA and HOEPA claims against Bankers Trust.

5.    Plaintiffs' motion for partial summary judgment (Doc. No. 35) is DENIED in its entirety.

BY THE COURT:

Legrome D. Davis, J.

26